Foster, J.
We are asked to determine whether or not sections 42 (subd. 3) and 193 (subd. 2) of the New York Insurance Law should be construed to prohibit appellant, an out-of-State life insurance company licensed in New York, from acquiring a controlling stock interest in a company doing a fire or casualty insurance business, and, if so construed, whether those sections would deny appellant equal protection of the laws and due process of law in violation of the State and Federal Constitutions.
This action for a declaratory judgment was brought in Supreme Court, New York County, by plaintiff, a Connecticut life insurance company licensed in this State, to obtain a determination that it properly might acquire a controlling interest in a fire or casualty insurance company, and nevertheless continue to be licensed by the Superintendent of Insurance to write life insurance in this State. The Special Term denied plaintiff’s motion for summary judgment, granted defendant’s cross motion, and dismissed the complaint on the merits. The Appellate Division, First Department, affirmed the order and judgment, one Justice dissenting.
The record reveals the following facts, stipulated and agreed upon by the parties. In 1955 appellant sought to acquire 80% or more of the common stock of National Fire Insurance Company of Hartford, a fire and casualty company licensed in New York, in exchange for shares of its own stock. After a public hearing on December 2, 1955, the Connecticut Insurance Commissioner approved and authorized the transaction. He found that the interests of policyholders and stockholders of both companies were not endangered by the proposed acquisition, and *47 that the terms of the proposed issuance and exchange of stock were fair and reasonable. A plan of acquisition was approved by appellant’s board of directors, and was to have been submitted to appellant’s stockholders on December 20, 1955. No formal vote was taken however because of the position taken by the New York Superintendent of Insurance.
The Superintendent concluded that the transaction if completed would constitute violations by appellant of both the investment limitations imposed on out-of-State life insurance companies by section 90 (subd. 1) of the Insurance Law and the provisions of sections 42 (subd. 3) and 193 (subd. 2) forbidding a foreign life insurance company licensed in this State from engaging in fire or casualty business.
At the request of the Superintendent, and upon the submission of memoranda by appellant and the Superintendent, the Attorney-General rendered an opinion on January 20, 1956. He agreed with the Superintendent’s interpretation of the investment limitation of section 90 (subd. 1) and found it unnecessary to render an opinion as to the application of sections 42 (subd. 3) and 193 (subd. 2). However he admonished the Superintendent as a duly constituted State agent that he must apply the Insurance Law “ evenly and consistently ” as to all classes of insurers.
The opinion of the Attorney-General construed section 90 (subd. 1) of the Insurance Law to prohibit absolutely a foreign life insurance company licensed in New York from acquiring substantially more than 2% of the common stock of any company.[1] This was so, reasoned the Attorney-General, because section 81 (subd. 13) prohibited a domestic life insurance company from acquiring more than that amount of common stock in another company and section 90 (subd. 1) limited a foreign life insurer to investments which complied in substance with the requirements imposed on a domestic life insurance company. He was unwilling to treat investments of a foreign life insurer in a fire company as nonadmitted assets and to test solvency and compliance with investment requirements solely on the basis *48 of sufficiency of admitted assets or permissible investments. Thereafter, by letter dated January 23,1956, the Superintendent notified appellant that appellant would no longer qualify to do business in New York if the proposed transaction were consummated.
By chapter 981 of the Laws of 1958, section 90 (subd. 1) was amended to provide that a foreign life insurance company’s investments would be tested on the basis of admitted, assets alone, and that investments which did not qualify would be disregarded in a determination as to compliance with investment requirements.[2] But the new statute also contained the clause that “ Nothing in this section shall be construed to relieve any foreign or alien insurer from compliance with any other provision of this chapter” (§ 90, subd. 3). The Governor in his memorandum of approval specifically stated that subdivision 3 left ‘ ‘ ‘ unaffected the application of other limitations imposed under Section 193 ’ ” (N. Y. Legis. Annual, 1958, pp. 500-501). However, he did not indicate his understanding as to the limitations of section 193. Following this enactment the Superintendent by circular letter dated June 11,1958, addressed to all authorized insurers, notified the industry of a proposed regulation interpreting sections 90, 42 (subd. 3) and 193 (subd. 2) as prohibiting foreign life insurance companies from thereafter acquiring controlling interests in fire or casualty companies “ in the interest of maintaining the public policy of this State ”.
Appellant appeared at the public hearing and objected to the promulgation of the regulation on the ground that the proposed interpretation of the Insurance Law was erroneous and invalid and if promulgated would deprive appellant of its rights in violation of the State and Federal Constitutions. Nevertheless, *49 the interpretation was adopted by the Superintendent and he thereby forbade future acquisitions of stock interests in fire or casualty companies, basing his conclusions on subdivision 3 of section 90. Thus, he reasoned, the restrictions imposed by sections 42 (subd. 3) and 193 (subd. 2) on out-of-State insurers were preserved. The present action was commenced by appellant on February 16, 1959.
Undoubtedly sections 42 (subd. 3) and 193 (subd. 2), the business limitations sections, forbid a foreign life insurance company licensed in this State from engaging in the business of writing fire or casualty insurance and, indeed, section 42 (subd. 3) forbids the converse situation, that of a fire or casualty insurance company engaging in the business of writing life insurance.[3] The real issue involved in this case is whether or not, by purchasing controlling interest in a fire or casualty company, the parent life insurance company actually is engaging in that business, and whether at any rate such an acquisition violates the investment provisions of section 90 (subd. 1). As appellant appropriately points out, the Legislature, in the Insurance Law, has used express language to prohibit certain activity through or by subsidiaries when that was its intention. Thus the very words ‘ ‘ Affiliate ”, “ Holding company ”, “ Parent corporation ’ ’, and 1 ‘ Subsidiary ’ ’ are defined in section 4 of the Insurance Law. In subdivisions 4 through 6 of section 78, officers and directors of insurers doing business in this State are forbidden to engage in self-dealing financial transactions with the insurers, or indirectly through “ affiliates or subsidiaries ”, Subdivisions 4 through 6 of section 85, and section 86, regulating and prohibiting certain investments by domestic insurers other than life insurance companies, expressly extend the limitations *50 to intermediate “ subsidiaries Subdivisions 2 and 3 of section 91 authorize the Superintendent to request financial statements of subsidiaries, and provide for assignation of values of insurance company holdings in subsidiary insurance companies. Subdivision 2 of section 188 prohibits rebates and discrimination through use of “ a subsidiary corporation”. The Insurance Law is replete with additional express references to subsidiaries and affiliates (e.g., § 44, subd. 8; § 111, subd. 2; § 119, subd. 4; § 204, subd. 1, par. [a]; § 204, subd. 1, par. [c]; § 221, subd. 2, par. [c]; § 221, subd. 3; § 223, subd. 2, par. [a]). And in 1948 the Legislature enacted subdivision 1 of section 67 (L. 1948, ch. 578) which authorizes the acquisition by any domestic, foreign or alien insurer of 1 ‘ the whole or any part of the capital stock of any other insurer or insurers * * # provided such * * * investment * * * is not inconsistent with any other provision of this chapter ’ ’. From these express references to subsidiaries, coupled with various limitations on their activities, and from the absence of express references to subsidiaries in sections 42 (subd. 3) and 193 (subd. 2), we may infer properly that the Legislature did not intend that the limitations of sections 42 (subd. 3) and 193 (subd. 2) be extended by implication to cover parent-subsidiary situations. This is a well-established canon of statutory construction (e.g., United States v. Wiltberger, 5 Wheat. [18 U. S.] 76; Iannelle v. Fire Comr. of Boston, 331 Mass. 250).
Such a construction, of course, is consistent with the general rule in this State that in no legal sense can the business of a corporation be said to be that of its stockholders (Matter of Green, 231 N. Y. 237, 246-247), or the business of a subsidiary corporation be said to be that of a parent (People v. American Bell Tel. Co., 117 N. Y. 241, 251-257; People ex rel. Edison Light & Power Installation Co. v. Kelsey, 101 App. Div. 205). It is consistent also with the settled rule that a subsidiary corporation may engage in a business forbidden to its parent, unless the subsidiary entity is used as a cloak to cover for fraud or illegality (Berkey v. Third Ave. Ry. Co., 244 N. Y. 84, 95; Jenkins v. Moyse, 254 N. Y. 319, 324). On this issue we agree with the dissent below that the Superintendent may not presuppose, “without justification, that the plaintiff will utilize a fire or casualty subsidiary as a mere agent or tool to evade the provi *51 sions of said sections ”, and that “ We are bound to assume that the mandate of the statute will be respected and that a subsidiary of plaintiff doing a fire or casualty business will carry on in the usual way, namely, as an independent corporate entity ’ ’. Appellant, in seeking to purchase a controlling interest in a fire insurance company, admittedly desires to improve its competitive position, and to enable its agents to offer to the public both life insurance and casualty and fire insurance. This does not, as the Superintendent argues, mean that appellant desires to engage in the fire or casualty insurance business. If the time comes that appellant, through the guise of a subsidiary, actually engages in that business, that will be time enough to refuse to renew appellant’s license.
No public policy would be offended by consummation of the proposed acquisition. Appellant’s admitted assets, capital and surplus apparently are sufficient to insure against insolvency and to protect policyholders in this State (§ 90, subd. 1, supra). Thus cases cited by respondent for the proposition that a parent-subsidiary scheme may not be employed to defeat and evade a canon of public policy found in a regulatory statute are not here relevant (e.g., Corn Prods. Refining Co. v. Benson, 232 F. 2d 554; United States v. Aycock-Lindsey Corp., 187 F. 2d 117; Matter of Iroquois Gas Corp. v. Maltbie, 251 App. Div. 528, affd. 279 N. Y. 575).
A short review of the history of the business limitations sections of the Insurance Law (§ 42, subd. 3; § 193, subd. 2) and their long-established administrative interpretation demonstrate, we think, the merit in appellant’s position. Since at least 1862, out-of-State insurance companies doing business in New York have been forbidden to engage in insurance business of a variety other than that for which they were incorporated. The 1862 statute remained in force until 1892. During this time the statute made no reference to subsidiaries or to investments (L. 1862, ch. 300, § 1).
In 1892 the laws relating to insurance were codified in the Insurance Law which remained substantially unchanged until 1940. From 1892 to 1940 out-of-State insurance companies licensed in New York were governed as to the kinds of insurance they were permitted to write by section 25, which limited out-of-State companies to the kinds of insurance business permitted *52 to domestic companies. Domestic life insurance corporations in turn were limited to the business of life, health or disability insurance and the purchase or disposition of annuities by section 70. Thus from 1892 to 1940 domestic life insurance companies and hence foreign life insurance companies were limited to the business of life insurance, annuities, accident and health insurance and personal injury liability insurance. No reference was made to subsidiaries or investments in those sections.[4]
The Insurance Law of 1892 also prohibited domestic and, therefore, out-of-State fire insurance companies from writing life insurance or casualty insurance. Section 70 from 1892 to 1940 limited domestic casualty insurance companies to casualty insurance and section 110 limited domestic fire insurance companies to fire insurance.
Sections 42 (subd. 3) and 193 (subd. 2) were enacted as part of the recodification of the Insurance Law, effective in 1940. They reiterated the prior business limitations. Like their predecessors they made no mention of subsidiaries or investments. At no time either before 1940 or after 1940 have the business limitations sections referred to the type of investments a particular kind of insurance company is entitled to make. Indeed, until the Superintendent’s interpretations in 1955 and 1958, the statutes for over 50 years had been interpreted by the Insurance Department and the industry as permitting an insurance company to acquire controlling stock interests in other insurance companies engaged in other forms of insurance business.
Thus in 1939 at the time of recodification of the Insurance Law there were in existence at least 49 ‘ ‘ fleets ’ ’, including the .¿Etna and Travelers fleets, comprising 231 separate insurance companies (Annual Report of Superintendent of Insurance, 1939, Vol. II [N. Y. Legis. Doc., 1940, No. 34], pp. 161a-164a). These so-called fleets were made up of a number of insurance companies each writing different kinds of insurance forbidden to its affiliates. The Superintendent himself recently has indorsed such arrangements and has pointed out their beneficial features (N. Y. Legis. Doc., 1958, No. 115, Yol. I-A, p. 96a). The New York Insurance Department has continued to license the individual companies comprising the numerous fleet operations since 1940, and the various companies owning controlling interests in subsidiary insurance companies carrying on a different type o'f *53 business (Best’s Life Insurance Reports, 1960; Best’s Insurance Reports, Fire and Casualty, 1960). Accordingly, it is quite clear that ‘ ‘ business limitations ’ ’ sections were not designed or interpreted to prohibit investments in companies writing a different type of insurance.
On the other hand, investments in subsidiaries or otherwise have been governed through the years by a series of statutes quite separate and distinct from the “business limitations” sections. Section 90 which presently regulates the investments of out-of-State insurers does not interfere with the acquisition of a controlling stock interest in another insurer so long as it has sufficient investments which comply strictly with the investment limitations imposed on domestic companies (admitted assets) and a sufficient surplus to policyholders looking solely to such admitted assets.
It is true that domestic life insurers are and have been limited rigidly as to common-stock investments, and are prohibited from obtaining controlling interest in other corporations. However since April 27, 1906 (former Insurance Law, § 100, added by L. 1906, ch. 326) such restrictions have not been imposed upon out-of-State life insurance companies. Indeed, it was in 1906 and 1907 respectively that Travelers and JEtna, two Connecticut life insurance companies licensed in New York, acquired controlling stock interests in companies doing fire and casualty business.
The 1939 recodification of the Insurance Law left the prior investment limitations sections virtually unchanged. The old section 100 was replaced by section 81 to the same effect. Sections 32 and 56 of the prior Insurance Law requiring investments of out-of-State insurance companies merely to “ remain secure ” and to be “ of the same general character” as those of domestic corporations were replaced by section 90 requiring the investments of out-of-State companies to ‘ ‘ comply in substance ” with the limitations on like domestic companies. The administrative practice under the new Insurance Law remained the same. The compliance of out-of-State companies continued to be tested solely on the basis of their admitted assets, i.e., those which complied strictly with the investment limitations on domestica companies (2 Examination of Insurance Companies [1953], pp. 196-197, by Chief of Audit Bureau of Insurance Department; *54 see, also, N. Y. Legis. Doc., 1959, No. 112, Vol. I-A, p. 50a, acknowledging administrative interpretation prior to 1956).
Sections 85 (subd, 4), 86 and 90 of the 1939 recodification repeated prior provisions permitting domestic and foreign fire and casualty companies to make substantial investments in common stocks including controlling stock interests. Interestingly, though sections 85 (subd. 4), 86, and 90 do not specifically authorize investments by fire and casualty insurers in life insurance company stocks, controlling interests in life insurance companies never have been viewed as violations of the business limitations sections.
In 1955 the Superintendent first interpreted section 90 as forbidding investments by foreign life insurance companies in fire and casualty companies. As indicated, this appeared to be a reversal of long-established practice recognized by the department itself. Thereafter, by chapter 981 of the Laws of 1958, it seems to us, the Legislature expressly readopted the old administrative practice and specifically made the test for foreign companies that of admitted assets. Indeed, a companion draft bill to amend section 193 (subd. 2) to prohibit investments by foreign life insurance companies in fire and casualty company subsidiaries never was introduced due to the objection of the industry. Thus under the business limitations and investment limitations statutes, and in view of the long-standing administrative interpretations thereof, appellant is entitled to invest in a subsidiary provided its remaining admitted assets are sufficient to comply with section 90 (subd. 1).
The Superintendent’s “interpretation” of 1958 would deny to foreign life companies the privilege of investing in fire or casualty subsidiaries after October 17, 1958. No statutory authority exists for that position, regardless of the construction given to the relevant Insurance Law provisions. Indeed, Travelers and JEtna continue to be licensed though they hold fire and casualty subsidiaries. They obtained their interests in subsidiaries, of course, prior to January 1, 1940, when the recodification of the Insurance Law became effective, but the recodification did not substantially alter the existing law. Nor is there anything legally significant about the October 17, 1958 date to justify its use as a “ cut-off” date. If Travelers and iEtna were entitled to invest in fire or casualty subsidiaries *55 prior to 1940 or prior to October 17, 1958, they still are entitled to so invest, as is appellant.
No sound explanation has been given for permitting foreign fire and casualty companies to invest in life subsidiaries, despite business limitations statutes (§§ 311, 316, 341, 344, 42, subd. 3), while forbidding foreign life companies from investing in fire and casualty subsidiaries. The possibility of a life parent depleting the assets for the benefit of its less stable fire or casualty subsidiary is no greater than the possibility of a parent fire and casualty company feeding upon the wealth of the more stable subsidiary life insurance company.
There being no recognizable basis for forbidding the investment herein involved, the statute should be so construed to allow that investment. The investment proposed is in accord with long-standing practice in the industry, the admitted assets of appellant seem to be sufficient, and the Superintendent’s interpretation would tend unduly to interfere with the internal affairs of a foreign corporation.
The lack of risk of harm to appellant’s policyholders is evidenced by the continued success of Travelers and ¿Etna. Appellant is in substantially the same position as those companies being third in size amongst the stock life insurance companies, third only to ¿Etna and Travelers.
Under the view we have taken it is unnecessary to consider whether the denial of the license to appellant by administrative interpretation of the statute, if the proposed acquisition were consummated, would deny to appellant equal protection of the laws and due process of law. In construing the statutes, of course, we have indicated that were the defendant’s interpretation and proposed enforcement of the statutes to be approved very real constitutional problems would arise. Seemingly, arbitrary and unequal treatment would be meted out to companies similarly situated (Power Co. v. Saunders, 274 U. S. 490; Mayflower Farms v. Ten Eyck, 297 U. S. 266; Morey v. Doud, 354 U. S. 457). We, therefore, would reverse on grounds of erroneous statutory construction by the Superintendent. There is little doubt that an action for declaratory judgment is the proper remedy in this case for this appellant certainly is involved in a legitimate controversy and is desirous of obtaining adjudication as to its rights.
*56 The order and judgment should be reversed, with costs in all courts, and summary judgment granted in favor of plaintiff-appellant.

. Section 90 (subd. 1) as it then existed provided in pertinent part: “ The superintendent may refuse a new or renewal license to any foreign insurer, if he finds that its investments do not comply in substance with the investment requirements and limitations imposed by this chapter upon like domestic insurers hereafter organized to do the same kind or kinds of insurance business,”

. The following pertinent language was added to section 90 (subd. 1) : ‘‘ For the purposes of this subsection, the investments of a foreign insurer shall be deemed to comply in substance with the investment requirements and limitations imposed by this chapter upon like domestic insurers hereafter organized to do the same kind or kinds of insurance business if, after disallowing as admitted assets in whole or in part any of its investments which do not comply with such investment requirements and limitations, the superintendent finds that the resulting surplus to policyholders of such foreign insurer would not be reduced below an amount which is reasonable in relation to the insurer’s outstanding liabilities and adequate to its financial needs; but in no event below an amount equal to the minimum surplus to policyholders required on organization of a domestic insurer to do the same kind or kinds of insurance business.”

. Those subdivisions provide:
§ 42, subd. 3. “No foreign insurer shall be licensed to do in this state any kind of insurance business, or combination of kinds of insurance business, which are not permitted to be done by domestic insurers hereafter to be licensed under the provisions of this chapter.”
§ 133, subd. 2. “No alien life insurance company licensed to do a life insurance business in this state shall, within the United States, and no foreign life insurance company licensed to do business in this state shall, except as stated in subsection six of section forty-two, within or without this state, do any kind or kinds of business other than those specified in paragraphs one, two and three of section forty-six.”

. See L. 1892, eh. 690, as amd.; L. 1909, ch. 33, as amd.